Argument not to escape 15 minutes, 15 minutes, Mr. Patello, United States of America. Good morning, and may it please the court. My name is Melissa Salinas. I'm with the University of Michigan Law School. I'm the supervising attorney in this case, and I have the honor of introducing Matthew Patello, who will present the argument. Thank you. Thank you. You know, as a student, you just saw two pretty good arguments. Yes, Your Honor. Hopefully, I can at least live up to half of them. Good morning, Your Honors, and may it please the court. My name is Matthew Patello, and I'm here today on behalf of Mr. Clay Shelton. Now, if I may reserve three minutes for rebuttal. All right. Thank you, Your Honor. Today, I will be addressing two issues. First, the requisite in connection with element for securities fraud, specifically regarding counts 11, 25, and 26. And next, I will be discussing the requisite intent to defraud under wires and securities fraud. Underlying these issues is a contention that the federal government should not be allowed to carte blanche, turn state civil liability and or criminal liability into federal criminal culpability. How about circumstantial evidence that we just heard about? Yes, Your Honor. Well, circumstantial evidence would have been beneficial for the first issue I am talking about today, the in connection with element for securities fraud regarding counts 11, 25, and 26. However, the record presents no individuated evidence regarding these two contributors, Mill and Tuttle. Didn't your client have some kind of quick summary that said he was getting this money only for an escrow and he was going to put it in escrow and almost immediately he spent it on junk bonds to pay himself? Isn't that pretty good evidence of criminal fraud? Well, Your Honor, I do want to be clear up front. With the in connection with element under choice, the recent most case from the Supreme Court on that element, you need a material connection between the material misrepresentation and an individual's decision to sell or purchase a security. So even if that document did promise to put contributions into an escrow account right away, which I would dispute. How would you dispute that? The specific language in that specific summary says that money can be escrowed. Well, you don't even know if the client's read that. Even if they did read it, it would be ambiguous as to whether you read the quick summary or not and wouldn't under contract law. That would be, you would look to the ambiguity against the person who wrote it. Well, we understand that in this instance, this is a hard standard to pass muster under. I get that. But here, the record doesn't contain any evidence of that nexus between that misrepresentation and the decision to purchase or sell a security. Without that evidence, that element, which is required, remains unproven under choice. Expounding on what that really means, the it needs to denote that there's a significant difference between that misrepresentation and the decision to purchase or sell a security. And that doesn't need to be reliance, and I concede that reliance is not an element under securities fraud. However, you do need to show some sort of receipt, acknowledgment, evidence of a misrepresentation being operative in a decision to purchase or sell a security. Being what? Operative. I'm sorry, Your Honor. Isn't the quick summary such evidence? No, Your Honor. It does not establish that nexus because it doesn't show that there is any effect on the recipient. And without that evidence, that element remains unproven. The effect was, as I understand it, he was told or read that he would get his money back if there wasn't $150,000 raised. Well, Your Honor, the record does not... And your client took it out and virtually gambled with the money. Well, Your Honor, on that last contention, there is another set of documentation that shows that Mr. Shelton was actually authorized... There you've got that ambiguity again, and you're stuck with that being against him. Well, I... You know, when you read your household or automobile insurance, it has a page that tells you what you bought, but it says on that page, this may differ or any definitions will be found in the policy at whole. The quick summary didn't have such language. It didn't, Your Honor. And I want to be clear here that that quick summary wasn't a binding term. It was just a summary. The agreement underlying escrow 2011 was governed by the private placement memorandum. It wasn't binding counsel, and it didn't mean anything. Why did he print it up? Well, because it assists the contributors into understanding what they're joining. Or it assisted the fraud. Arguably. Your Honor, I dispute that, respectfully, of course. But the private placement memorandum here, it does show what Mr. Shelton was authorized to do, and the contributors received that documentation Do you think anybody would have given him money if he told them that when I get it, I'm going to pay myself a salary, and I'm going to buy junk bonds? Yes, Your Honor, primarily because he did tell them. The private placement memorandum specifically said that he had the discretion to utilize the funds however way he saw fit to further the purpose of the agreement. And he did. I don't want to get too far into the second issue I'm going to discuss, which is the intent to defraud. Still going back to the in connection with element. You may be right. I mean, anybody gave him money in the first instance might have given him money in the second. I don't know. Of course, he used some of the money for personal expenses, and there's no way he could explain that away. For personal expenses to manage the companies he was running to further the ambition of Escrow 2011. It wasn't simply to go buy yachts or anything else excessive like that. It's to keep the lights running at the companies furthering the purchase of the Monterey Pipeline, which he never ceased to do. The evidence for that is actually found in the indictment itself. Count 7, which was dismissed, charged Mr. Shelton with money laundering because he wired funds to an investment group in Canada. That investment group was a possible financer for the pipeline. Okay. I may be backing you up a bit because you've already covered this, but with respect to what he disclosed and what he did and the disconnect there, didn't he basically evade questions from investors for a number of years and sort of give them a run around in order to further the real activities and objectives of this enterprise? That's the information in the quick summary and the memorandum. Didn't he basically just deliberately evade and avoid and mislead people to cover up the real motives, objectives and actions? Well, I'll take your question as an opportunity to switch to the intent to defraud element because I think that question goes to the heart of that matter. The private placement memorandum at first says that anything said orally isn't a binding term under this agreement. If Mr. Shelton provided any deceptive advice, which I don't think he did practice, that what he was doing after the formation of the agreement might have evidenced negligent business practices, but it doesn't show that he started SCROW 2011 with the intent to defraud. You're not saying that that language gave him a license to, given the last case we had, I want to use my words carefully, but you're not saying that it gave him a license to mislead or deceive? No, Your Honor, not a license to deceive or mislead, but it does set out the discretion that he had in managing the partnership. I'm talking about in response to a direct question. An investor asks a question and he responds to that question with false information or misleading or deceptive information. That's not covered by the language in that disclosure, is it? Well, no, not specifically, Your Honor, but as to what Mr. Shelton did after the fact, the formation of the partnership, it might not have been the most sound business practices. I get that. However, does it change what could and possibly should be at most state civil liability to federal criminal liability? Is he informing the partnership? The law says that he needs to start the partnership with the intent to defraud. Just because down the road he might have provided some misleading responses to questions about the success of the partnership could evidence his misunderstanding of sound business practices. Well, seemingly he did more than that in terms of his potential criminal culpability in that he never actually set up an escrow account, a separate escrow account. He had the funds available to him for other purposes other than that to serve the aims of the investors. So the fact that, and of course he had access to that account for purposes other than what he told the investors would be. The fact that he didn't actually ever set up the escrow account is a problem for your client in this case, wouldn't you agree? Because the investors were told we could go back and forth as to what they were told of their understanding, but they did have the understanding that there would be an escrow account for this investment and that was a falsity on the part of your client, was it not? I disagree, your honor. The documentation in question here doesn't say that an escrow account will be set up immediately. It says that it will be set up at his discretion when there is sufficient funding to start the partnership. So that wasn't achieved. Well that suggests that the funds would have been retained until there was sufficient funds to constitute the amount he needed to get the bank financing from the Canadian bank that was supposed to come up with $15 million when he had the $1.5 million down payment for the pipeline from the escrow account, but he'd never get to the $1.5 million if he was taking money out to use for non-related purposes. And he knew that the investors were counting on the money going into this escrow account to accumulate to this $1.5 million and he didn't do that. Well, no, your honor. He didn't retain the contributions immediately, but he wasn't mandated to do that. Well, you know, the other thing was he really didn't have a bank that said they would give him X amount of dollars if he got $1.5 million. He contacted a bank, but never into any kind of specific kinds of loans or how he would get a loan or anything like that. Isn't that true? Well, your honor, he was in the process of facilitating all that and things fell through. But when he was getting the money from the sheep, so to speak, he never had that done,  It wasn't certified up front. It wasn't certified and there was nobody you could point to that testified from a bank that, yeah, we were going to give him $50 million if he raised $1.5 million. The IRS agent in question, the one that testified for the government here, testified that he contacted an individual with the bank that said that they were closing. But you never had the banker come in and say, yeah, I'd do this. He never had a scrap of cash. So the whole thing starts with a lie. Well, not necessarily, your honor, no. It doesn't start with a lie because it wasn't supposed to be off the ground immediately. It wasn't truthful is why it started with a lie. Well, it was an aspirational partnership, your honor, that they wanted to achieve this It's often risky. This one was. Mr. Shelton fell through with his obligations here because he was unable to attain the financing. And at most, that's non-performance on the contract to do so. Is that federal criminal fraud? Who else would be opposed to that? He's the one raising the money. Well, your honor. I mean, seriously, you're in a court of law. Who else would do that? Sorry, your honor, to be subjected to that liability. Who else was supposed to do this other than the defendant? Arrange for a loan and so forth. Well, him and his sales manager, of course, because they were running the partnership. And they failed to do that. And I totally accept that. It's just that isn't enough under Frost and under Lee to turn this into federal criminal fraud. I'm out of time. And if there are no more questions, I'll take my seat. All right. Thank you very much. Morning. Good morning, your honors. May it please the court. Newt Bonner on behalf of the United States. Addressing the two issues that the appellee brought up. The in connection with argument that they made and also the intent to defraud argument that they made. The first thing really to say is exactly what Judge Sir Heinrich just said. And that is that the whole thing started with a lie. Escrow 2011 started with the lie that Mr. Shelton made to numerous investors. And he said, if you give me $50,000, you will purchase a unit in a partnership. And I will put the money from that unit into an escrow account. And there it will stay until I am able to raise $1.5 million. And if I am able to raise $1.5 million, then you will profit in one of two ways. Either you'll get a 25% interest payment on your unit, on your investment. Or you will be able to get a buyback up to the amount you invested in prior investments with me that you have made. And that was a lie because as this panelist pointed out several times, he never put any of that money into an escrow account. He used all of that money to keep his businesses going, to make payroll, and also to invest in junk bonds with a lawyer down in Texas. He never created an escrow account. He had no intent to create an escrow account. All of the investors at trial testified that that is specifically what Mr. Shelton told them. I will put this money in an escrow account, and there it will stay. And it did not stay there. And that is certainly sufficient evidence to support his intent to defraud. The private placement memorandum is mentioned many times by the appellant. And that is a red herring because the only thing that this court needs to determine is whether the evidence at trial was sufficient that any rational trier of fact could find the elements beyond a reasonable doubt. And this jury did. What the jury found was he had the intent to defraud, and there was plenty of competent and substantial evidence for them to find that. They had the testimony of the investors. They had the actual transactions of the investors making payments on their units, and then the transactions of Mr. Shelton not putting that money into an escrow account, but putting it into whatever he wanted to do with it that furthered his own personal and business interests. So that is all that this court needs to determine is, is that sufficient evidence for a jury to reject the theory of defense that this private placement memorandum actually allowed Mr. Shelton to do whatever he wanted to do with the money when, in fact, he told them through the quick summary and personally and through his salesman, Aaron Grogan, that I will do something else with it. That may have been a good theory of the case on another jury, that yes, I told these investors one thing, I gave them the quick summary that says the exact same thing, but if they had read the private placement memorandum, they should have known as intelligent investors that I didn't have to do that. The jury could have bought that theory of defense at trial, and they didn't, and Mr. Shelton was convicted. Is there sufficient evidence for them to convict him? And the answer is that there is, through the quick summary, through the testimony of the investors, and through the actual use of the money he received as part of Escrow 2011. So on the first issue of was there intent to defraud and was there sufficient evidence for a jury to find that, this court should have no problem finding that he did, in fact, have the intent to defraud. The second issue raised by the appellant a moment ago was the in connection with, and the appellant concedes that reliance is not required to be proven by the government in a securities fraud case. Specifically, the in connection with argument relates to the units bought by the Tuttles and Mr. Dinger, who unfortunately were not able to testify at trial because they were deceased or suffering from Alzheimer's disease. So they were not actual witnesses at trial. But the in connection with argument, we do not have to prove that the Dingers, the Tuttles, or Mr. Dinger actually relied upon the quick summary or Mr. Grover and Mr. Shelton's material misrepresentations. All we have to do is prove that his lies were material and they were. Materiality, of course, is that is this quick summary that says I will put this money in an Escrow account and is his misrepresentations to the investors saying I will not use this money, I will put it into an Escrow account until I raise $1.5 million. Would an intelligent investor consider that information significant when contemplating an investment decision? That's in the mind of the investor. Is it material for a reasonable investor to think that? And from Mr. Shelton's perspective, we must ask ourselves whether it's material, whether the lie was made with the purpose of getting the victims to part with their property. Did he tell them I will only put your money into an Escrow account in order to get them to give their money to him in the purchase of units? And the answer to both is yes. That's materiality. The in connection with argument, and they rely primarily on the Trois case, reliance on the Trois case is misplaced. That case does not involve a criminal prosecution. That involves a civil class action lawsuit and whether state class action lawsuits can be brought underneath the federal securities laws. Trois and the Halliburton case cited by the appellant, they have different elements where reliance by plaintiffs is addressed in those cases. But the circuit courts have said that securities fraud do not require reliance by the Tuttles or Mr. Dinger on Mr. Shelton's misrepresentations. All that required is would that be material to a reasonable investor. So the fact that the Tuttles and Mr. Dinger did not testify that they relied on this at trial, it doesn't matter. And even though they didn't testify on a trial, there's still circumstantial evidence that they probably would have testified that way had they been at trial. You can infer based upon the testimony of the other investors and based upon family members of the Tuttles and Mr. Dinger that they probably got the same quick summary agreement that all the other investors did and the same material misrepresentations were made by Mr. Shelton and Mr. Grogan to the Tuttles and Mr. Dinger. So that in itself would be sufficient evidence of reliance, not that we really needed to prove it. The important thing within connection with is did Mr. Shelton's material misrepresentation touch on the fraud? Did it accompany the fraud? And of course it did. The reason that he made those material misrepresentations and he said that he would only put their money in an escrow account was to get the victims to part with their money. It related to the fraud. It wasn't an irrelevant lie that he told these investors. He told these investors so that they would take a particular course of action and purchase units in escrow 2011. So those are the two issues brought up a moment ago by the appellant, and those are the reasons that the court should reject those arguments and find that there was more than sufficient evidence to find Mr. Shelton guilty. And that's really all that we are looking at in their first assignment of error. The appellants also brought up in their brief, they argued that these units in escrow 2011 partnership wasn't actually an investment. They argued that it was a loan. It was not a loan. It was definitely investment. And the reason we know that is the Howie Foreman test, which of course has three elements. Was it an investment? What is a security? What is an investment? Well, it's an investment of a common venture where there are reasonable expectation of profits and they're depending upon the managerial efforts of Mr. Shelton. And all four of those elements are met. It was certainly an investment. It wasn't a loan. This was not Mr. Shelton going to a bank seeking $1.5 million. This was Mr. Shelton going to a variety of individuals, almost all of whom have actually invested with him in the past and asking them to give him money in a partnership. That's what it was. So it was an investment. Was it a common venture? Yes, it was. All of the investors gave Mr. Shelton money for these units for the exact same purpose. And that is so that he could, through his own managerial efforts, raise $1.5 million so that then he could get a follow-on loan for $15 million and buy a pipeline. All of these investors had the common venture in giving Mr. Shelton this money. Of course, they expected profits in order to do it, and Mr. Shelton indeed promised them profits. He said, your money, if I'm able to raise this $1.5 million, it will stay in an escrow account, and once I get the $1.5 million, I will give you 25 percent on top of your investment. And then finally, all of this was done, or supposed to have been done, under the terms of the quick summary and the partnership through the managerial efforts of Mr. Shelton. Mr. Shelton was the only one in charge of going out. I'll just interrupt and say that Mr. Shelton's attorney said that the quick summary did not say that it will be placed in an escrow account. It said it can or may be placed. So are you representing that the agreement said it will? I am, Your Honor. Okay. Okay. That that money was going to be placed in an escrow account, and all of the investors said that that was their understanding or else they wouldn't have given him money at all. So it is actually an investment that Mr. Shelton made. It was a security, and in order for this court to find that it wasn't a security  the only way that we can get there is if the record is completely devoid of any evidence whatsoever that it was actually a security because of the plain error standard on which you have to examine that issue. And not only is the record not devoid of evidence that these were securities that he was selling, there's plenty of evidence there that these were in fact securities under the Howey-Foreman test and then specifically under the risk capital test that we use in order to determine whether something is actually an investment. All of those elements are met. And finally, before I run out of time, the final, excuse me. Finally, twice. Yeah. You know, sometimes the best argument is brevity. I mean, you don't have to use 15 minutes because we were given that. You don't have to, but it's okay. I understand, Your Honor. Well, hearing that, unless the court has any other questions, I thank you for your time. Thank you. Thank you. Any rebuttal? Counsel, do you agree with the government's definition of what constitutes a security for purposes of our case here? I do not, Your Honor. As it relates to escrow 2011, that is not a security. Okay.  of what constitutes a security, what do you disagree with or what definition would you provide in the place of the government's? Well, I'm sorry if I was being misleading, but under Howey-Foreman, that is the definition that is applicable here for an investment contract being a security. Okay. So you do agree with the definition? I agree with that. I disagree with how the government applies that definition, however. The three elements cited in the brief all indicate that escrow 2011 was not a security. The first one, of course, is it an investment at all? No, it's a loan. The form of the agreement does not involve the stereotypical hallmarks of an investment. Instead, this is a static loan that generates, if anything, set interest. There's no appreciation of capital. There's no expectation of the... Well, now you're disagreeing with the jury's fact-finding because the jury was given the definition of a security in the jury instructions, and now you're just saying basically you're disagreeing with the facts found by the jury at this point, are you not? No, Your Honor. I'm saying no rational jury could find that that was a security. That's the distinction here. I'm not saying anything about that jury in particular. I'm just saying this evidence properly construed does not constitute security. It constitutes a loan. Moving forward, under the second element, was there horizontal commonality? Also, no. Under Cherepnin v. Knight, we have to look at the economic reality. Here, the reality says that these funds were applied discordantly, and they were never commonly pooled. The lack of common pooling under Union Planters is indicative of the lack of a security. And then the last element, is there a reasonable anticipation or expectation of profits? Also, no. Under the Supreme Court, Foreman, and also Union Planners, there's no expectation of profit. There's no anticipation of capital gain. There's nothing to say that this was more than putting money as a loan into a fund and at most getting back interest. I'm sorry, where's the testimony that this was a loan? Well, actually, there were two investors that said that this was a loan, and they're adamant about that. Oscar Henskin, I believe the one was. He invested most of the money into this. But doesn't that become a jury question again? My problem is where I think you've got a hard road to hoe is you seem to be arguing facts and trying to make those questions a law. And that's tough, in fairness to you. Thank you, Your Honor. I accept that this is a hard standard, and I know I'm out of time, but if I may quickly respond. It's a hard standard to prove, but it's proven here under both the facts and the law. Both issues cited today, the intent to defraud, United States v. Frost and United States v. Lee from the circuit, both militate towards the conclusion that there is no requisite intent to defraud. For the in connection with element, Troyes from the Supreme Court and Roland v. Green, affirmed by Troyes from the Fifth Circuit, also militate towards the conclusion that that element was not satisfied for counts 11, 25, and 26. For those reasons, we respectfully ask this honorable court to vacate and remand. Thank you. All right. Thank you very much for a very good first argument. And the case is submitted, so we thank the parties for their arguments.